[No. A122125. First Dist., Div. Three. July 29, 2009.]

EDWARD SALSEDO, Plaintiff and Respondent, v.
DEPARTMENT OF PARKS AND RECREATION, Defendant and Appellant.

## COUNSEL

Mathews, Kluck, Walsh & Wykle and Kelly M. Walsh for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriquez, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and Anita E. Ruud, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

POLLAK, J.—California's Department of Parks and Recreation (CDPR or the department) appeals a preliminary injunction ordering it to issue to plaintiff Edward Salsedo a permit for vehicle access to Gold Bluffs Beach located within Prairie Creek Redwoods State Park. This park is one of three state parks in California's north coast that, together with Redwood National Park, a federal park, form Redwood National and State Parks (RNSP), some 105,516 acres of parkland managed cooperatively by CDPR and the National

Park Service (NPS). After Salsedo's prior permit for vehicle access to Gold Bluffs Beach for the purpose of commercial surf fishing was revoked, he brought a petition for a writ of mandate to compel the department to reissue it. The trial court issued a preliminary injunction awarding such relief pending the final resolution of the action, rejecting, among other arguments, the contention that under the current management structure NPS is a necessary and indispensable party without whose appearance no valid injunction can be entered. According to the department, the injunction that has been entered orders it "to do something it does not have the power to do." We conclude, as did the trial court, that despite the cooperative arrangement for managing the parklands within RNSP, CDPR retains the authority to issue permits for access to the area that remains within state jurisdiction and that NPS is not an indispensable party to these proceedings.

## BACKGROUND

### Redwood National and State Parks

In 1968, the United States Congress authorized the creation of Redwood National Park. (Act of Oct. 2, 1968, Pub.L. No. 90-545, 82 Stat. 931–934.) The boundary that was designated included a significantly larger area than what is now the federally owned Redwood National Park. In anticipation that California might transfer to the United States three of its state parks— Jedediah Smith Redwoods State Park, Del Norte Coast Redwoods State Park, and Prairie Creek Redwoods State Park—the statute authorizes a single federal park encompassing all of these parks.[1] The House of Representatives conference report on the legislation pointed out that under the statute the three state parks "will be acquired only by donation" and continued: "Whether the State will donate its parks and other lands will be up to it to decide. If it decides not to do so, the National Park Service will nevertheless be expected to cooperate with State officials to minimize administrative problems and to offer to the American public a full opportunity to enjoy the beauty and grandeur of the Redwood country." (H.R.Conf.Rep. No. 1890, 90th Cong., 2d Sess., p. 7 (1968).) The conference report also contained the following paragraph of significance to the present dispute: "The conference report recommends the inclusion in the park boundaries of a strip of offshore submerged land one-quarter mile wide the full length of the park. This is done with the understanding that fishing, both sport and commercial, will be allowed to continue in the area involved and that the laws governing the same will be the laws of the State of California." (*Id.* at p. 9.)

---

[1] Section 3(a) of the statute creating Redwood National Park provides: "The Secretary [of the Interior] is authorized to acquire lands and interests in land within the boundaries of the Redwood National Park . . . ." "[L]ands and interests in land owned by the State of California may be acquired only by donation." (Pub.L. No. 90-545, 82 Stat. 931.) The statute authorized the appropriation of $92 million for the purchase of private lands to form the park.

California did not transfer the three parks to the federal government and these state parks remain under the jurisdiction of CDPR. Instead, in 1994 NPS and CDPR entered a memorandum of understanding in which they agreed to cooperate in managing the four parks. In this memorandum, the two agencies agreed, among other things, to "mutually adopt the designation 'Redwood National and State Parks' . . . for use by both agencies in referring to the area within the congressionally authorized boundary of Redwood National Park," "[t]o the extent practicable . . . to commit the respective resources, staff, equipment and facilities assigned to [RNSP] to the common protection of all resources contained within [RNSP], as well as for the appropriate enjoyment and appreciation of the same by the public, without regard to governmental ownership," and to "seek to attain cooperative operating procedures and practices that result in efficiencies and cost savings accruing to both partners." Further, "[t]o the extent practicable and maintaining agency identity, work performed in [RNSP] will be conducted by personnel without respect to agency affiliation. Through signing, publications and other instruments of communication with the public, the cooperative management of [RNSP] by CDPR and NPS should be projected to visitors, park neighbors and governmental entities."

Pursuant to the memorandum of understanding, in late 1999–early 2000 CDPR and NPS adopted the RNSP General Management Plan/General Plan (the management plan) (<http://www.parks.ca.gov/?page_id=24851> [as of July 29, 2009]). The management plan recites that "Redwood National and State Parks in extreme northwestern California consist of four units—Redwood National Park, which is a federal park under the jurisdiction of [NPS], and three state parks—Prairie Creek Redwoods State Park, Del Norte Coast Redwoods State Park, and Jedediah Smith Redwoods State Park . . .—which are under the jurisdiction of [CDPR]." (Management plan, at p. 3.) The management plan states that its purpose "is to provide a clearly defined, coordinated direction for resource preservation and visitor use and a basic foundation for decision making and managing these four parks for the next 15 to 20 years." (*Ibid.*) The management plan was regarded as "the first phase of tiered planning and decision making. Because this plan is relatively general, more detailed, site-specific analyses of specific proposals in this approved plan will be required before undertaking any additional major federal or state actions." (*Ibid.*)

In the section of the management plan entitled "Public Use, Recreation, and Visitor Safety," the plan describes as an issue the use of vehicles on several beaches within the parks, including Gold Bluffs Beach. "Depending on locations, this off-road vehicle use occurs in connection with [among other activities] commercial surf fishing activities, primarily for smelt, conducted in accordance with provisions of the legislative history of the 1968 Redwood National Park enabling legislation and 1985 *General Plan for Prairie Creek*

*Redwoods State Park.* [¶] Vehicle use on . . . Gold Bluffs Beach is subject to a CDPR permit system." (Management plan, *supra*, at p. 59.) The management plan then describes the following proposed action: "NPS and CDPR regulations prohibiting off-road vehicle use will be enforced throughout the parks, resulting in the elimination of all off-road vehicle use other than that which is essential to provide access for commercial surf fishing activities. Off-road vehicle use associated with commercial surf fishing at . . . Gold Bluffs Beach . . . will continue by renewable, nontransferable annual permit only. However, only permits issued between March 1996 and September 1, 1999, will be renewed, no new permits will be issued, and any permit not renewed in a given year will be terminated. These actions will be taken, despite the provision in the national park's legislative history, to meet the NPS and CDPR statutory obligations to protect the RNSP resources and enhance public enjoyment of RNSP resources and values, and to provide consistent management of vehicle use on NPS- and CDPR-managed beaches." (*Id.* at p. 60.)

As contemplated in the management plan, NPS and CDPR subsequently entered "Cooperative Management Agreements" for the cooperative management of RNSP.[2] The first such agreement was entered in 2002 for a term of five years, and a substantially similar agreement for another five years was entered in June 2007. The agreements define with greater particularity the respective responsibilities of NPS and CDPR in managing RNSP. Both agencies again agree they shall "[m]utually adopt the designation 'Redwood National and State Parks' (RNSP) in referring to the area within the congressionally authorized boundary of Redwood National Park" and that they shall "[u]tilize the joint General Management Plan/General Plan approved in 1999/2000, or as may later be modified or amended, to guide the management of RNSP." The agencies agree to "[d]evelop joint operating procedures and standards to ensure effective and efficient accomplishment of RNSP activities" and specifically, "[t]o develop joint procedures for processing permits authorized by the agencies including but not limited to . . . special public uses." The agreements provide that CDPR shall "[s]taff the position of State Park Superintendent to manage the state park lands within RNSP on a day-to-day basis in conjunction with the NPS Superintendent. The State Park Superintendent shall be stationed at RNSP Headquarters in Crescent City,

---

[2] Salsedo points out that CDPR failed to bring these agreements to the attention of the trial court and suggests that we not consider them for that reason. While we hardly condone the failure to cite them below, there is no doubt about the authenticity of the agreements or of this court's ability to take judicial notice of their existence. Both parties have addressed the agreements in their appellate briefs and their consideration is necessary to resolve the issues that are presented by the appeal. Therefore we grant CDPR's request that we take judicial notice of the agreements and of the management plan. We deny the request to judicially notice the letter from the Office of the Solicitor of the Department of the Interior to Salsedo's counsel, stating the NPS opinion concerning legal issues raised by the appeal.

with responsibility and decision-making authority on behalf of" the three state parks, including Prairie Creek Redwoods State Park.[3]

In reaction to the proposed phaseout of special use permits for commercial fishing described in the management plan, in 2006 Congress enacted the Northern California Coastal Wild Heritage Wilderness Act (the Act). (Pub.L. No. 109-362, § 10 (Oct. 17, 2006) 120 Stat. 2064.) Section 10 of the Act, a provision entitled "Continuation of Traditional Commercial Surf Fishing, Redwood National and State Parks," provides: "For the sole purpose of continuing traditional commercial surf fishing, the Secretary of the Interior shall permit the right of entry for authorized vehicle access onto the wave slope area at that area known as Gold Bluffs Beach, Prairie Creek Redwoods State Park . . . . The number of permits issued under the authority of this section shall be limited to the number of valid permits that were held on the date of enactment of this Act. The permits so issued shall be perpetual and subject to the same conditions as the permits held on the date of the enactment of this Act." (*Id.*, 120 Stat. 2073.)

*Salsedo's permits*

Salsedo has fished commercially along Gold Bluffs Beach for many years. Commercial surf fishing requires off-road vehicle access to the beach and for many years he has held annual special use permits authorizing such access. The first such permit in the record is for the period April 1, 1999, to March 31, 2000. This permit is on a letterhead reading, "Redwood National and State Parks, Prairie Creek Redwoods State Park" and is signed by Richard C. Sermon, as "State Park Superintendent, Redwood State & National Parks." The permit recites that it is issued "[i]n accordance with Department of Parks and Recreation Order #1-111-3, Section 3, dated April 23, 1985."[4] The permits for the subsequent three years are on a letterhead referring only to Redwood National and State Parks, are signed by individuals identified as "State Park Superintendent" and as "National Park Superintendent" and recite that they are issued in accordance with the CDPR order and "title 36 Code of Federal Regulations, section[s] 1.5 & 4.10(A)." The 2005–2006 and 2006–2007 permits recite that they are issued in accordance with the same CDPR order "and Redwood National Park enabling legislation (House Conference Report #1890, dated September 11, 1968)." The 2007–2008 permit, the subject of the revocation order, recites that it is issued in

---

[3] The agreements obligate NPS to staff the position of NPS superintendent who shall have similar authority "to manage the NPS lands within RNSP on a day-to-day basis in conjunction with the CDPR Superintendent."

[4] This order stated that off-road vehicles were prohibited in designated areas of Gold Bluffs Beach, but section 3 provided, "Exceptions to this closure order may only be granted in writing by the District Superintendent of the Klamath District."

accordance with "Public Law 109-362 dated October 17, 2006, and the Department of Parks and Recreation Order #2-635-14 dated May 1, 2006."[5] The last three permits are on an RNSP letterhead and are signed by the "State Park Sector Superintendent" and by the "Redwood National Park Superintendent."

In July 2007, Salsedo received a letter advising him that for violating certain conditions of the permit, his access permit was being suspended for 30 days. By a letter dated August 29, 2007, he was advised that because of these violations his permit was revoked. Both letters are on a letterhead reading, "United States Department of the Interior, California Department of Parks and Recreation, Redwood National and State Parks," and are signed by the "National Park Superintendent" and by the "State Park Superintendent." The letter of revocation states: "Your permit was issued under the authority of federal law (Public Law 109-362), and is revoked in accordance with the policies and regulations of the National Park Service."

*The litigation*

On February 27, 2008, Salsedo filed in the superior court a petition for a writ of mandate and other relief. The petition names as respondents CDPR, the former and then current state park superintendent, and the state park ranger who had confiscated Salsedo's key to the access gate to Gold Bluffs Beach.[6] The petition challenges the revocation of Salsedo's access permit, alleging that the permit conditions he allegedly violated on which the revocation was based are unauthorized, that "such revocation was not supported by the facts, and such revocation was an arbitrary and capricious decision by respondents in furtherance of their unlawful plan to completely phase out the permits, which plan was directly contradicted and nullified" by Public Law No. 109-362. The petition also alleges that the revocation violated Salsedo's right to due process and that the basis for the revocation is not supported by substantial evidence. In addition, Salsedo alleges that he "acquired, for good and valuable consideration" three access permits for commercial surf fishing from other individuals and that CDPR has refused to recognize the transfers, wrongfully asserting that the permits are not transferable.

---

[5] Order No. 2-635-14, issued by CDPR on May 1, 2006, is entitled, "Vehicle Traffic Allowed on Beaches by Permit." The order provides that certain persons, including "commercial fishermen," are eligible for permits allowing limited vehicular access to certain beach areas, including those at Prairie Creek Redwoods State Park, and that "[p]ermits must be approved by the Superintendent of the Redwood Coast Sector of California State Parks." Further, "[e]xceptions to this Order may only be granted in writing by the Superintendent, North Coast Redwoods District." The order recites that it is authorized by Public Resources Code section 5003 and California Code of Regulations, title 14, sections 4301 and 4326. The order makes no reference to NPS, its superintendent, or federal law.

[6] In discussing the litigation, we include the named individuals within our references to "CDPR."

Shortly after filing the action, Salsedo obtained a temporary restraining order and an order to show cause why a preliminary injunction should not be issued. CDPR opposed the application, arguing that Salsedo could not show a reasonable likelihood of success because NPS is an indispensable party that had not been and could not be joined in the action, and because the permit restrictions that Salsedo was found to have violated are reasonable and proper. On June 10, 2008, the court issued a preliminary injunction directing CDPR "forthwith" to issue Salsedo an access permit for the current permit year (upon his tendering the customary permit fees), to provide him the necessary keys for access to the wave slope, and to refrain from issuing to others the three permits Salsedo had recently purchased or taking any action that "would result in less than four permits for vehicular wave slope access being available to issue to" Salsedo should he prevail in the action. CDPR has timely appealed from that order, which is an appealable order (Code Civ. Proc., § 904.1, subd. (a)(6)).

### DISCUSSION

### I. *NPS is not a necessary or indispensable party*

■ The principal contention made by CDPR on appeal is that NPS "is indispensable within the meaning of subdivision (a) of section 389 of the Code of Civil Procedure [because] complete relief among those parties who are already parties cannot be granted in that party's absence." We shall not repeat what many courts have explained about the two-step analysis that must be made under section 389—first, to determine whether an absent party is a necessary party under subdivision (a), and then, if so, whether the party is indispensable under subdivision (b). (See, e.g., *Countrywide Home Loans, Inc. v. Superior Court* (1999) 69 Cal.App.4th 785, 791 & fn. 3 [82 Cal.Rptr.2d 63]; *County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1149 [63 Cal.Rptr.2d 277].) Although the department's argument conflates the two questions, we shall assume that if, as CDPR contends, it is powerless to issue an access permit to Salsedo without the concurrence of NPS, then NPS is a necessary party under section 389, subdivision (a) because complete relief cannot be accorded among the existing parties in its absence,[7] and an indispensable party under section 389, subdivision (b) because the court lacks the ability to compel the federal agency's appearance and a judgment without it will be inadequate. (*County of San Joaquin v. State Water Resources Control Bd., supra,* at pp. 1152–1153.)

---

[7] See *Countrywide Home Loans, Inc. v. Superior Court, supra,* 69 Cal.App.4th at page 794, footnote 6, citing 4 Moore's Federal Practice (3d ed. 1998) section 19.03[2][c], page 19-43, for the proposition that courts are more likely to apply the complete relief test in two situations, one of which is where an absentee's participation is required to provide injunctive relief to an existing party.

Despite the discretion that is normally accorded the trial court in determining whether a preliminary injunction is appropriate, the issue presented here is a pure question of law as to which this court will make an independent determination. (*Carsten v. City of Del Mar* (1992) 8 Cal.App.4th 1642, 1649–1650 [11 Cal.Rptr.2d 252]; *Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1094–1095 [271 Cal.Rptr. 44].)

There is no doubt, as the department argues, that CDPR and NPS are cooperating in the management of RNSP, including the management of Gold Bluffs Beach within Prairie Creek Redwoods State Park. This cooperation and integration of management functions is consistent with the expressed congressional intent when Redwood National Park was created and with the plans and agreements that CDPR and NPS have subsequently approved and entered. The Cooperative Management Agreements provide that the two agencies will "develop joint procedures for processing permits authorized by the agencies" and they apparently have done so. Although CDPR alone issued access permits to Gold Bluffs Beach through 2000, Salsedo's subsequent permits have been issued over the signatures of both the state and federal park superintendents and recite that they are issued pursuant to both state and federal law. Although the two agencies had agreed to phase out permits authorizing vehicle access to Gold Bluffs Beach, this plan was aborted by Congress's enactment of Public Law No. 109-362, which provides that "the Secretary of the Interior shall permit the right of entry for authorized vehicle access" and that "[t]he number of permits issued under the authority of this section shall be limited to the number of valid permits that were held on the date of enactment of this Act." The letters suspending and revoking Salsedo's permit were signed by the national park superintendent and the state park superintendent. The revocation letter states that the permit had been issued "under the authority of federal law (Public Law 109-362)" and was being revoked "in accordance with the policies and regulations of the National Park Service."

Nonetheless, although the state and federal agencies have been acting in unison, and at times have purported to act pursuant to federal law, the underpinnings of the relationship between the two agencies do not support the view that ultimate authority over the management of the state parks has been relinquished by the state. The Public Resources Code provides that "[t]he Department of Parks and Recreation has control of the state park system" (Pub. Resources Code, § 5001) and it directs the department to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public" (*id.*, § 5003). CDPR and NPS have agreed to cooperate and to develop joint management procedures, as they

have been authorized to do,[8] but they have not agreed to cede to the other their ultimate authority over the lands within their respective jurisdictions. The management plan explicitly acknowledges that Redwood National Park is under the jurisdiction of NPS and that the three state parks are "under the jurisdiction of" CDPR. The Cooperative Management Agreements are explicit with respect to the federal government. Both agreements recite that "[p]ursuant to 16 U.S.C. § 1a-2(*l*), the NPS is authorized to cooperate with State and local park agencies for the more effective and efficient management of adjacent park areas, *so long as the administrative responsibilities for any unit of the National Park System are not transferred.*"[9] The provision in the Public Resources Code authorizing CDPR to enter cooperative agreements contains no such qualification, but the agreements clearly are reciprocal in nature. Under the 2007 Cooperative Management Agreement, CDPR is to "[s]taff the position of State Park Superintendent to manage the state park lands within RNSP on a day-to-day basis," just as NPS is to "[s]taff the position of [NPS] Superintendent to manage the [NPS] lands within RNSP on a day-to-day basis." In both cases this management is to be "in conjunction with" the other superintendent, but in both cases the primary responsibility rests with the superintendent of the agency having jurisdiction over the land in question.

That the state is intended to retain jurisdiction over the state parks, despite the agreement to cooperate with federal authorities and to develop joint management procedures, is made unmistakably clear in the legislative history of both the 1968 legislation creating Redwood National Park and in the 2006 legislation prohibiting the phaseout of access permits for commercial fishing at Gold Bluffs Beach. As indicated above, the House of Representatives conference report on the 1968 legislation stated that it was "up to" California to determine whether it would donate its three parks to the national park. If it did not do so, the report does not suggest that the state's authority over its land would in any way be curtailed, but rather states that the NPS would be "expected to cooperate with State officials to minimize administrative problems." (H.R.Conf.Rep. No. 1890, 90th Cong., 2d Sess., *supra*, at p. 7.) The inclusion within the park of a strip of submerged land was recommended "with the understanding that fishing, both sport and commercial, will be

---

[8] As both of the Cooperative Management Agreements recite, CDPR is authorized by Public Resources Code section 5080.30 to enter agreements with "any agency of the United States for the care, maintenance, administration and control of lands under the jurisdiction of the CDPR by any party of the agreement, any party to the agreement for the purposes of the State Park System." NPS authorization to enter the agreements is found in the Department of the Interior and Related Agencies Appropriations Act, 1998 (Pub.L. No. 105-83, § 501(j) (Nov. 14, 1997) 111 Stat. 1614) and in federal statute (16 U.S.C. § 1a-2(*l*)).

[9] The federal statute authorizing NPS to enter such agreements provides explicitly that "[t]he Secretary may not transfer administrative responsibilities for any unit of the National Park System under this paragraph." (16 U.S.C. § 1a-2(*l*).)

allowed to continue in the area involved *and that the laws governing the same will be the laws of the State of California.*" (*Id.* at p. 9, italics added.) In providing that the state parks would become part of the federal park only "by donation," the legislation itself implicitly recognizes that California would continue to exercise jurisdiction over its parks if it did not donate them to the United States.

The management plan approved by CDPR and NPS in 1999–2000 recognized the continuing applicability of the requirements of California's Public Resources Code with respect to the management of the state parks, and pointed out that the management plan contained "[a]ll elements required [by the Public Resources Code] to be included in state park general plans." The Cooperative Management Agreements that were subsequently entered provide that the two agencies will cooperate and develop joint operating procedures, but they do not say that either agency relinquishes its ultimate authority over the lands within its jurisdiction. To the contrary, the agreements explicitly recognize that the state park superintendent has "responsibility and decision-making authority" over the three state parks. The agencies agree to "perform work without regard to agency affiliation" but only "[t]o the extent practicable and subject to maintaining agency identity." Each of the agreements incorporates an August 1996 statement of "The Mission, Vision and Guiding Principles" of RNSP, stating that "[e]ach agency functions as an equal partner, deserving of the other's respect and understanding." The agreements do not imply that either agency relinquishes its authority to act within its jurisdiction without the consent of the other. To the contrary, the agreements contemplate the possibility of disagreements and provide somewhat opaquely for the resolution of disputes.[10]

The history behind Public Law No. 109-362, enacted well after the entry into the initial Cooperative Management Agreement, is even more explicit. The discussion on the floor of the House of Representatives preceding adoption of this provision confirmed that the bill was intended to "put a stop to the phase-out [of surf fishing permits] by continuing 27 fishing permits for smelt." (Remarks of Rep. Walden, Debate on H.R. No. 233, 152 Cong. Rec. H5633 (daily ed. July 24, 2006).) On the floor of the Senate, Senator Bingaman, the ranking member of the Senate Energy and Natural Resources Committee, first sought and received from Senators Boxer and Feinstein, the

---

[10] Both agreements contain the following provision: "In the event of any dispute arising under this Agreement, the injured party shall notify the injuring party in writing of its contentions by submitting a claim therefore." The statement of the Mission, Vision and Guiding Principles of RNSP provides that "[w]e support consensus decision-making and the established priorities of the partnership. When consensus cannot be achieved we will pursue alternative dispute resolution." Another provision states, "When legal or policy constraints inhibit our ability to work together to achieve our common mission, we will seek relief from those constraints."

sponsors of the companion Senate Bill (Sen. Bill No. 128), confirmation that section 10 of Public Law No. 109-362 was not an implied waiver of applicable laws "but rather a directive to the Park Service to discontinue its plan to completely phase out these [commercial surf fishing] permits." (152 Cong. Rec. S10538 (daily ed. Sept. 29, 2006).) Senator Bingaman then continued, addressing what has become the crux of the issue in the present appeal: "The language in section 10 requires the Secretary of the Interior to issue permits allowing for authorized vehicle access to designated beaches, including Gold Bluff[s] Beach, within Prairie Creek Redwoods State Park, which is located within the broader national park boundary. This provision is unusual in that, on its face, it appears to require the Secretary to authorize access to a beach that is within a State Park and managed by the California Department of Parks and Recreation. However, *I understand that nothing in this section is intended to override the responsibilities of the State of California and its management of [the] state park.* Is that the understanding of the chairman and bill sponsors as well?" (*Ibid.*, italics added.) Senators Boxer, Feinstein and Domenici responded that they agreed with this understanding, Senator Boxer adding, "The language in this bill does not impose requirements on the State of California." (*Ibid.*) Senator Bingaman then placed in the Congressional Record a letter addressed to him and to Senators Feinstein and Boxer from Congressman Mike Thompson, the sponsor of the legislation in the House of Representatives, confirming the same understanding.[11]

Thus, pursuant to the agencies' agreements to cooperate and to coordinate their activities, the access permits to Gold Bluffs Beach that have been issued since 2001 have been issued in the name of RNSP and over the signatures of the state and federal park superintendents. Nonetheless, the fact that the two agencies have integrated their operations in this manner does not alter the fact that Gold Bluffs Beach remains within the jurisdiction of the State of California and that CDPR has jurisdiction over that beach and the statutory authority to grant permits for vehicle access to the beach.[12] CDPR may agree to utilize standards and follow procedures that have been adopted in consultation with NPS and that correspond to the standards and procedures applied to the federal park land, but the state parks remain within the jurisdiction of the state and CDPR remains bound by the mandates of state law not

---

[11] The letter reads in part: "[T]he language in Section 10 requires the Secretary of the Interior to issue permits allowing for authorized vehicle access to designated beaches, including Gold Bluff Beach, within Prairie Creek Redwoods State Park, which is located within the broader national park boundary. However, *nothing in this section is intended to override the responsibilities of the State of California and its . . . management of the state park.*" (152 Cong. Rec., *supra*, S10538, italics added.)

[12] As indicated above, CDPR order No. 2-635-14, cited as authority for the issuance of Salsedo's revoked access permit, provides that "[p]ermits must be approved by the Superintendent of the Redwood Coast Sector of California State Parks."

inconsistent with federal law, and by the orders of California courts. If a California court finally determines that CDPR violated state or federal law in revoking or failing to issue an access permit to Salsedo and orders CDPR to issue him a permit, the department will be bound to follow that order. Nothing in the management agreements or in the underlying statutory authorizations precludes such compliance. And, as made unmistakably clear in the portions of the Congressional Record quoted above, Public Law No. 109-362 was not intended to affect CDPR's authority in this respect. The federal legislation directed NPS to discontinue its plan to phase out access permits to Gold Bluffs Beach. This congressional directive may or may not apply to CDPR, an issue we need not resolve at this point, but it certainly did not purport to remove from CDPR its fundamental authority over the issuance of permits for access to the state lands.

■ Hence, it follows that the superior court can award Salsedo complete relief in these proceedings in the absence of NPS and that NPS, therefore, is neither a necessary nor an indispensable party. That is not to say that NPS should not be permitted to appear in the proceedings should it wish to do so, but the superior court cannot compel such an appearance and may in all events proceed to determine whether Salsedo's permit was properly revoked and whether CDPR is obligated to issue him a new permit.

## II. *Transferability of access permits*

The only other contention that CDPR makes on this appeal is that the court should not compel it to issue new access permits to Salsedo to reflect the rights he has purchased from others because, by the very terms that the access permits have contained for many years, the permits are not transferable. Salsedo responds that in order to comply with the directive in Public Law No. 109-362 that the existing permits "shall be perpetual," the permits must be transferable. The resolution of this dispute requires consideration of numerous subsidiary issues. Does Public Law No. 109-362 control the issuance of permits by CDPR? If so, can a permit be perpetual if it is not transferable? If not, do other provisions of state law authorize or preclude the transferability of the permits? What conditions, if any, may be imposed on the transferability of the permits? How is the requirement in Public Law No. 109-362 that the permits be perpetual reconciled with the further requirement that they be "subject to the same conditions" as the preexisting permits, which provided that they were not transferable? What is the significance of having previously accepted access permits that purported to be nontransferable? These and other issues have not been fully explored either in the trial court or in the parties' appellate briefs. Contrary to the department's implicit assertion here, the trial court has not ordered that the additional permits be issued to Salsedo. Insofar as it relates to those additional permits,

the preliminary injunction merely enjoins CDPR from transferring them to other persons or from taking any other action that would preclude transferring them to Salsedo if he ultimately prevails on this issue. The preliminary injunction does no more in this respect than preserve the status quo pending resolution of Salsedo's right to acquire the permits he has purchased. The department suggests no harm resulting from this restriction, and we perceive none. There was no abuse of discretion in this respect.

## CONCLUSION

The department asserts no other reason why this court should set aside the preliminary injunction. Since we reject its contention that NPS is a necessary and indispensable party, and find the temporizing provisions concerning the transferability of the additional permits well within the trial court's discretion, we shall affirm the court's order.

## DISPOSITION

The preliminary injunction order, entered on June 10, 2008, is affirmed.

McGuiness, P. J., and Jenkins, J., concurred.